Next case is Barbara Richardson as receiver versus the United States 2022-15-20. Mr. Meebeg. Good morning, Your Honor. Good morning, Your Honors, and may it please the Court. We're here today because the trial court committed three reversible errors. First, the trial court completely subverted the party's contract and refused to give effect to the agreement's plain language, which preserved the government's offset rights, notwithstanding any other contractual provision. Second, the trial court eviscerated decades of binding Supreme Court precedent by holding that a sovereign immunity waiver isn't required for a state court to bind the federal government. And third, the trial court granted non-monetary declaratory relief as to 31 U.S.C. 3728, which isn't permissible by the Court of Federal Claims, and more than that, granted that relief when there was no case or controversy regarding Section 3728. So I'll begin with the contractual errors. With respect to the contract, the trial court completely turned it on its head. The sole question before the court was whether the government preserved its offset rights in the event of Nevada Health's default, and the trial court went out of its way to ignore the only provision that addresses those circumstances. Section 19.12, entitled Right of Setoff, clearly and plainly preserved the government's offset rights, notwithstanding anything else in the contract. 19.12, though, says permissible, not required, but permissible as appropriate, qualifying it, the offset. And 3.4 is clearer. It subordinates the government's claim. A couple things, Your Honor, and what you said is partially correct. So the trial court harped on these words, appropriate and available, in Section 19.12, but the trial court read those terms out of the actual provision. Available is just a general reference to the rights, remedies, and techniques that are typically available to the government. And appropriate just makes clear that the government is entitled to use the appropriate, whatever right is appropriate to those circumstances. For example, 19.12 mentions salary offsets, which clearly wouldn't be appropriate. But what 19.12 doesn't say is that offset is only available if Section 3.4 says it. It's actually the opposite of what 19.12 says. It says, notwithstanding any other provision, including 3.4, the government's offset right survives. The claims court said 19.12 is more of a truism that preserves the government, whatever rights it would normally have as appropriate. That's correct, Your Honor. And that's one of two ways in which the trial court explained its subversion. But both of those subversions contradict black-layer tenets of contract interpretation. How about 3.4, the subordination clause? Excuse me, Your Honor? How about 3.4, which is clearer, which subordinates the government's claim? Your Honor, two things about Section 3.4. First, the trial court construed it to be a default provision when it doesn't actually address default. Default is addressed in other provisions of the agreement, such as 19.12, which lays out what the government's rights are. But in any event, even if what the court said with respect to Section 3.4 were correct, the courts at most would have created a conflict between those provisions. But the court ignored the parties' agreement about what to do in the event a conflict arises. That's why the parties used notwithstanding provision. These provisions are clearly meant to convey the parties' agreement that in the event that any provision could possibly be construed to the contrary, that this particular provision controls. When you say this, what are you referring to? Section 19.12, Your Honor. So in your opinion, 19.12 would somehow trump 3.4 if there is a conflict? Is that your view? Yes, Your Honor. It says that notwithstanding anything else to the contrary. And the Supreme Court, this Court, has said that these notwithstanding clauses have effect. And the trial court was required to read the contract in such a way that gives effect to the provisions of the contract. The trial court wasn't to just say that an entire provision is just a truism, that it means nothing. Why shouldn't we view 19.12 as just kind of a catch-all provision based off of the actual language stated there? Two reasons. I apologize if I'm repeating myself. But the trial court was required to read a contract in such a way that it gives effect to all of its provisions. The notion that the parties include this provision but it has no meaning is contrary to how courts are supposed to interpret contracts. And this is the only time the parties utilize a notwithstanding clause. Nowhere else in the agreement did the parties say that. That's clearly meant to signal the parties' intention that this provision controlled just in case there are circumstances in which another provision could have been construed to the contrary. So if we find that 3.4 is what applies in like a default situation, do you agree that the government has waived its offset rights? We do not agree, Your Honor. Because, again, 19.12, notwithstanding anything to the contrary, the trial court didn't grapple with that. The most natural reading of 3.4 is that it controls while Nevada Health is operating. It says so at the very end of the agreement. That's also the understanding of all the parties, including the Nevada Insurance Commissioner, when the parties first entered into the loan agreement. After the contract was signed, the parties had to go back and amend the agreement to especially waive the government's offset rights with respect to the solvency loan. Because keep in mind, this loan agreement covers two separate loans. And so when the loan agreement was first signed, the government's offset rights were preserved with respect to both loans. It wasn't acceptable to the Nevada Insurance Commissioner. And so that's why the commissioner required that the loan agreement be amended to especially waive the government's offset rights with respect to the solvency loan. But only the solvency loan. No amendment was ever requested with respect to the startup loan. And so the government's offset rights were especially preserved with respect to the startup loan. Otherwise, there would have been no need for the parties to ever amend the loan agreement if the government's offset rights had already been waived. How does the state of Nevada treat loans that have an offset provision in it that apply to startup loans? I'm sorry, Your Honor. Can you repeat that? What does the government in Nevada do? What's the law in Nevada with respect to offsets involved in startup loans? There is no law. Nevada law not only expressly permits, but especially requires that mutual debts be offset. And so there are circumstances in which certain kinds of debts the state may require that offset rights be waived. And that's why the state requested that the solvency loan be amended because it previously did not waive the government's offset rights. And there's no law in the books that requires that a startup loan, the government's offset rights be waived with respect to the startup loan. Your Honor, that brings me to the court's second error of law. And that was that the trial court ignored extensive precedent by holding that a sovereign immunity waiver isn't required for a state court to bind the United States. The trial court had essentially four justifications, all of which were wrong. The trial court initially relied on this court's decision in Conway. But Conway was a preemption decision involving a federal administrative scheme that permitted offset that conflicted with the state law that prohibited non-contractual offset. And the trial court never addressed sovereign immunity or contractual offset rights. Here, Nevada state law actually permits and requires offset. And the contract also allows offset. And there are no preemption issues. The trial court also relied on a series of cases addressing interim jurisdiction. When this isn't an interim action, this is an impersonal action brought against the United States in the court of federal claims. The trial court applied buffer abstention principles after especially holding that buffer abstention doesn't apply. And the trial court also said that the government's submission of a proof of claim waives the government's sovereign immunity. But the Supreme Court for decades has held that that's not true. That a minister act by an executive officer doesn't waive the government's sovereign immunity. Which of the cases dealing with sovereign immunity do you think are most analogous to the present case? I will say United States v. Shaw, Your Honor. That was a case in which the government has submitted a proof of claim in a state probate matter. And the Supreme Court especially held that that mere submission of a proof of claim in the state court doesn't waive the government's sovereign immunity. A waiver of sovereign immunity must come from Congress and it must be unequivocal. Does Section 3.4 of the agreement, the loan agreement, does it apply in the event of default? And if so, how does it apply? Your Honor, it does not apply in the event of default. Section 3.4 doesn't address default. If anything, as the section lays out, it's meant to address circumstances where the company is still operating. And what that provision does is it was meant to protect the government's initial investment by having the company prioritize its continued operations. But once the company defaulted under the contract, that's when provisions like Section 19.12 come into play. Lastly, Your Honor, I'd just like... So when we look at the arguments that are made with respect to antecedents, and that's under 3.4, correct? Yes, Your Honor. Okay, so you're saying that 3.4 wouldn't apply, so those arguments have no meaning here? 3.4 has no meaning. Once Nevada Health ceases to operate, 3.4 is no longer operative. That's a revision that controls while the company is operating. Why isn't that while the company is operating just relating to subsection C of 3.4? You seem to contend, I think, that it relates to other subsections as well. Or is that the argument you're making? Tell me. Yes, Your Honor, that's the argument that we're making. The trial court relied on this doctrine of the last antecedent and applied it as an absolute rule when it's not. It's at most a guidepost. And what this court has said is that you look to the actual context of the provision. And so when you look at the contract as a whole, what the parties did in 3.4, what they did in 19.12, the requirement that the loan agreement be amended to waive offset rights, you take all that together, the most natural reading of 3.4 is that it only applies while Nevada Health was operating. Last point I'll make is that the trial court erred in addressing 3728. No case of controversy regarding that. The parties never raised or briefed that issue. And I'll reserve my time for rebuttal. Thank you, Your Honor. Thank you, Counsel. Mr. Ferrario. Thank you, Your Honor. May it please the Court. What we have here is the latest iteration of a number of cases that have come before you. The last case was Conway. And in Conway, the government was attempting to leapfrog other insolvency creditors through offset rather than paying its debt in full and making a claim against Colorado. In that case, Colorado Health Estate. They're doing the same thing here. And they're doing it here by, quite frankly, torturing the language of the loan agreement. And I respect the arguments of counsel. But the simple fact of the matter is when you look at this holistically and you start at the beginning, okay, and that's really where you have to start. The co-op, in this case, the insurance company, is a creature of statute in Nevada. The statute that authorized borrowing of the loan here, and the parties are presumed to know the law, including the federal government, 693A180, makes it very clear that money that is borrowed, similar here, in fact, it applies specifically to the start-up loan, that money borrowed under 693A180 cannot be the basis of offset. That's the starting point. Okay? Can you address Section 3.4 and also what I was talking about with the opposing counsel about whether or not the wild borrower portion just applies to Subsection C or to other subsections? Well, you know, I've read their papers and I listened to argument today and I find the arguments, quite frankly, unpersuasive. Judge Solemson did a deep dive, entertained argument, and I think quite appropriately said that the claim of the government that Section 3.4 somehow evaporates in the event of insolvency is simply not supported by the language. And then he also prophylactically said that you construe this contract against the drafter, which was the government. If the government had wanted Section 3.4 and the subordination provision to disappear, they could have written that clearly in the agreement. They did not do that. Okay? The only part of Section 3.4. Shouldn't they have placed that language in the default section? It should have been in the default section. It could have been in Section 3.4. Does it matter that it's not in the default section? It's not anywhere in the agreement. And what the government's trying to do is seize upon Section C of 3.4 to eviscerate Sections A and B. Judge Solemson saw that for what it was and disregarded that argument. And whether it's the last antecedent rule or whether you just read this according to its terms, there can be no question that A and B of Section 3.4 apply no matter what if they don't disappear upon default. And it makes sense, and I'll tell you why. Do you know when subordination is most important? It's in a default setting. That's where it really comes into play. So the government's argument is wrong on the language, wrong on the law, and it is not consistent with common sense. What is your interpretation of the phrase cash flow and reserves in Section 3.4? Cash flow and reserves are very simple. When you're operating, and that's why you have the period, when you're operating as an insurance company, you have reserve requirements and typically cash flows. And so that's why Section C is carved out, and it deals where you're operating as an insurance company. And you have to maintain required reserves, and you have to meet the requirements of state law. In a liquidation, which is what we have here, basically what you're doing, and I'm sure the court knows this, and it's an area that has been quite, and this relates to other parts of Judge Solomon's opinion, it's an area that has been, excuse me, but I've got a cold and a little dry mouth here. It's an area that has been ceded to the states under McCarran-Ferguson. States govern insurance, and part of that is the liquidation process. And that's what this court recognized in Conway. Can you also talk about Section 19.12? Section 19.12, and I think the questioning has already illuminated where I'm going to go. If it's available and it's appropriate, then you might have set off. Here it was neither available because, as Judge Solomon said, the debt had not become due because you had not paid the superior creditors. And it wasn't appropriate for the reason that I started out. When you look at the agreement and you look at 693-A-180, it wasn't appropriate in this context. And no amount of- The trial court did find that offset was permissible in Nevada, right? It is permissible. In certain circumstances it is, but the general statute dealing with offset would not trump the more specific statute, 693-A-180, which is in effect the enabling statute that allows the co-op to even get off the ground and mandates what you have to do in order to facilitate the operation of a co-op. So you have a specific statute that, in my opinion, would trump the general statute, even if the government had a legitimate claim, but they don't here. What is your response to opposing counsel's argument that Section 19.12 trumps 3.4 and looking at that notwithstanding language? Because, as Judge Solomon said, you have to read the contract as a whole. You have to give effect to all the provisions. If you read the contract like the government wants you to read it, you are then doing violence to 693-A-180, and you are then taking out the essence of this agreement, which is that this funding was subordinate to policyholders and then claims of operation. And that's what they want you to do. They want you to rewrite the deal. They could have made that clear and they didn't, and that's where the available and appropriate language kicks in. In this context, offset would result in a violation of Nevada law, and it would result in an evisceration of the agreement and the very basis for which this deal was cut. So do we need to refer to the Nevada statute to interpret this particular contract? I don't think you do. I'm citing the statute as further evidence if you go back to the beginning. But, no, you can look at the contract as Judge Solomon did, and with all due respect to counsel, the reading of the government does not give effect to every provision. The reading of the government amounts to a rewrite. Judge Solomon made it very clear that in certain circumstances where you do have a surplus and you have paid your superior creditors, then you may have a preserved offset right. At that point, it would be available and it would be appropriate. But when you have not satisfied the creditors that are superior to your subordinated debt, your debt is, number one, not due, and it would not be consistent with Nevada law or the terms of the agreement to go ahead and effect an offset. Are appropriate and available fact questions determined by the claims court? I don't think they were fact questions, Your Honor. I think Judge Solomon made it very clear that he could look at the agreement. He found no ambiguity. He construed it as a whole. I think his rationale is sound. I don't think there is any need for that because, again, when you look at this holistically and you go back to the beginning for the purpose of this loan, it is very clear that offset would not have been permitted here. Again, logically, it makes sense. If you had offset, what would it do to the subordination language? What relevance would it have until you have a default, until you're in a runoff situation? That is when it is most applicable. And so the government wants to write that out. And that, to me, would be inappropriate here, and I don't think it would be consistent with any Nevada law or any principles of contract interpretation, quite frankly. If we were to hypothetically find in your favor, do we need to reach issue two? Actually, you don't. And as you prepare for these, I know you all have been in my position, and you look at all these arguments. While I think Judge Solomon is absolutely correct, when the government participates in a, and I think that you're talking about issue two, a liquidation process, which is really the, and to put this in context, it is the only place where you can have an orderly wind down of an insurance company. States regulate this area. States have insurance regulations. Part of those regulations deal with wind down and liquidation. We, the government, and this has been curious to me, the government came to Nevada and filed a claim. They have now tried to avoid the consequence of that claim with a variety of arguments, saying, well, we were just doing it in case there was a surplus, whatever. The fact is, the government interjected itself into that process. And again, I think we have to look at this as two sophisticated parties from the beginning, and again, I'm not going to rehash what's in Conway, because I think this court did an excellent job of analyzing insurance law, analyzing the ACA, and made it very clear that everything points to the government having to go to the states and participate in the liquidation process. And there's Supreme Court precedent, the Bank of New York case, that states very clearly you do not implicate notions of sovereign immunity when the government itself interjects itself into the proceeding. And as this court said in Conway, that is the place where you go resolve these complex creditor fights. And so there is no implication of sovereign immunity, and we're not here contending that the Nevada court could compel the government to pay. In fact, we came to the Federal Court of Claims, and we filed our action. Given any indication it would seek an offset under Section 3728? 3728, as I looked at that, Judge Solemson reached that issue because of some tactics that were being employed by the government in Conway. And he, I think quite appropriately, ruled in aid of our ability to collect the judgment that he gave us, $55 million. And I think I need to point this out, too. This is something I wanted to bring up. There is no dispute the government owes us at least $38 million in the exact numbers in our brief. They have yet to pay that, $38 million. And so Judge Solemson, looking at the tactics of the government in Conway, seeing where they were going, said 3728 is essentially a waste of time. And he cites a case from this court, and it's in, I believe, footnote 11 of our brief, that says you can take a practical view of things, and if the next step is a waste of time, you don't have to go there. So what he did is he says we're not going to make the co-op and the receiver go in circles anymore. And, you know, I have not understood why the government has made this argument. I don't see what it is they're trying to preserve. We've done everything we can. We've come to the Federal Court of Claims. We obtained a judgment. We've had a ruling on the set-off. They don't pay us the $38 million that we're owed. And now they want us to come back and present this to the Secretary of the Treasury, and they say that the Secretary of the Treasury would be a party. That argument, quite frankly, and we addressed this in our brief, really doesn't make any sense. It's the government that's the party. So Judge Solemson took a practical, holistic view of this and said we're not going to get, in aid of your collection of this judgment, we're not going to play any 3728 games. That's all he said. And I think that was appropriate because at the end of the day, what has become abundantly clear, and I'm here now, I think this started in 2015. It's 2023. Okay? We have been at this for a very long time. It's 2024. I'm sorry. It is 2024. Okay, keep going. I just wanted to make sure I was in line. We want it to be 2023. Happy New Year. Huh? It's 2024. We've been at it a long time. And I think Judge Solemson saw this for what it is, and he wants to bring an end to it, and he appropriately did so with a very well-reasoned and thorough opinion. And, again, while I applaud the government and, you know, as lawyers, we sometimes are paid to torture language in agreements and cite cases and go to the outer limits, when you step back and you look at this in light of where this began, okay, and what the intent of the parties were, I don't think there's any question that Judge Solemson's decision was correct on the law in terms of contract interpretation. And, more importantly, it's consistent with the express intent of the parties as embodied in Section 3.4 of the loan agreement. It can't be any clearer. The loan is a subordinated loan. It is to be risk-based capital. You can't write those out of the agreement. And it's subordinate, most importantly, and that's what we're talking about here, and I think it's important to know this, it's subordinate to the claims of the policyholders. The claims of the policyholders here exceed what the government owes us. So we're not doing violence. Can you briefly address the amended promissory note? Sure. And what that does with respect to the waiver? It actually helps us, quite frankly. And, again, I'm not going to bore you. My partner over here is a CPA, and he has spent hours talking to me about accounting treatment. All that was happening here with the surplus note was they were trying to effectuate an accounting treatment under the Statement of Statutory Accounting Principles No. 41, and this is at Appendix 1913. And that accounting statement requires that you do certain things. That's all. So they wanted to classify the surplus note, not the startup loan. And so what they did is they ended up having to specifically comply with that statute. The original loan documents had some of the language in different places, but that principle requires that it be in one place. All they did was modify the surplus note to accomplish that accounting treatment. Most importantly, in the second amendment. Does that alter the application or the offset? Not at all. Not at all, because it only dealt with the startup loan. And most importantly, Judge Rayner, in the Section 1918 or Appendix 1918 of that agreement, it reaffirms the earlier agreement. They didn't touch the subordination language in the earlier agreement, and it reaffirms that document, and we've already made those arguments. But also, most importantly, if you look at the financial statements that were presented around that time, the startup loan that they're now saying was somehow not a subordinated debt is identified clearly on the financial statements as a subordinated debt. It's also referenced in the note as a subordinated debt. But all that aside, no matter what somebody does for accounting treatment, you don't alter the underlying agreement between the parties. Thank you, counsel. Thank you. Thank you very much. Thank you, Your Honors. With the couple minutes I have left, I'd just like to make a couple points in response to my colleague. First, regarding Section 3.4, it doesn't evaporate when the vital health defaults or anything like that, but it does yield to Section 19.12, and that was agreed to by the parties. My colleague mentioned the McCarran-Ferguson Act, which has no relevance here. That deals with conflict between state and federal law. And here, state and federal law are in agreement that the United States is entitled to offset debts. Again, offset wouldn't violate state law. State law requires that mutual debts be offset. Regarding the notion of policyholder claims and the payment of policyholder claims, just to remind the Court that the government gave the vital health two different kinds of loans, and so they still have $40 million in solvency loan funds, and those amounts are what are used to tackle this backstop to satisfy policyholder claims. The startup loan by statute and by agreement wasn't used for that purpose. It was used to get the company off the ground, and those funds have already been spent. Those funds were never intended to satisfy policyholder claims. Regarding the notion that the government hasn't- The trial court said that it gave no meaning to the notwithstanding clause and determined that 9.12 was only a truism. How do we take that? This is a provision within a loan agreement that the parties arrived at that you drafted. Convince me that the trial court was correct on that. I think the trial court was wrong that 19.12 is a truism. There are no truisms in the contract for two reasons. One, the parties address what happens when Nevada Health defaults under the loan agreement. I mean, that's a particular circumstance that comes up. The parties also included a notwithstanding clause. It's the only time that the parties use that. It doesn't make sense that the parties will utilize this provision, which has special legal significance, in a clause that has no meaning whatsoever. And more than that, trial courts are required to construe contracts in such a way that gives effect to all of its provisions. Courts aren't to look at provisions and just decide that a particular provision doesn't mean anything when the parties gave meaning to it and gave special meaning to it by inserting a notwithstanding clause. What is your brief response to the fact that it be construed against the drafter? There's no reason to construe the agreement against either party. All the court needs to do is give effect to the agreement's plain language. Thank you, Your Honors. Thank you, Counsel. The case is submitted, and we will deal with it without altering any language. Thank you.